**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **TOM A. MCWHIRTER,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 3:11-CV-608-BF** |
| | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

This is an appeal from the decision of the Commissioner of the Social Security Administration ("the Commissioner") denying the claim of Tom A. McWhirter ("Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 423. The Court considered Plaintiff's Brief, Defendant's Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. For the following reasons, the final decision of the Commissioner is REVERSED and REMANDED.

**Background**[1]

**Procedural History**

Plaintiff applied for disability benefits on October 15, 2008, alleging disability due to carpal tunnel syndrome, diabetes, neuropathy, bipolar disorder, hypertension, and cardiovascular disease. (Tr. 160-61, 206.) Plaintiff's application for disability was denied initially and upon reconsideration. (Tr. 107-108, 111-115, 118-120.)

Plaintiff requested a hearing, which the ALJ held on October 8, 2009. (Tr. 49-101, 129.) Plaintiff, represented by counsel, testified at the hearing along with a vocational expert ("VE"). (Tr.

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

49-101.) The ALJ issued an unfavorable decision denying Plaintiff's disability claim on November 18, 2009. (Tr. 31-44.) The ALJ found that Plaintiff had the following severe impairments: insulin-dependent diabetes mellitus, diabetic neuropathy, hypertension, opioid dependence, bipolar disorder, carpal tunnel syndrome, mild cervical degenerative disc disease, and obesity. (Tr. 36.) The ALJ found Plaintiff retained the RFC to perform the following:

> lift and carry 20 pounds occasionally and 10 pounds frequently; sit throughout an eight-hour workday, stand and walk (individually or in combination) for four hours in an eight-hour workday, with no walking or standing for extended periods (i.e., no more than 15-20 minutes at one time); and otherwise perform the full range of light work, except he is further limited to: no climbing ladders, scaffolds, or ropes; only occasional climbing ramps or stairs; only occasional balancing, stooping, kneeling, crouching, or crawling; and no operating foot controls with his bilateral lower extremities, and he is limited to jobs with no extensive and involved contact with the public and supervisors (e.g., no negotiating, selling, or resolving customer complaints for an employer) and jobs involving detailed, but not complex, instructions.

(Tr. 37.)[2]

Plaintiff requested review from the Appeals Council on March 17, 2010. (Tr. 27.) On February 4, 2011, the Appeals Council declined to review Plaintiff's claim, finding no basis upon which to overturn the ALJ's decision. (Tr. 1-6.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

---

[2] Light work is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying up to 10 pounds. Even though the weight lifted may be very little, a job in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. 20 C.F.R. § 404.1567(b).

**Plaintiff's Age, Education, and Work Experience**

Plaintiff was born on November 25, 1960, and was 45 years old on his alleged onset date, September 23, 2006.  (Tr. 54.)  He obtained a GED, and finished one semester of college.  (Tr. 55.)  His only past relevant work[3] was as a computer programmer for 16 years.  (Tr. 59, 188.)  Plaintiff was last employed in September of 2007.  (Tr. 55.)

**Plaintiff's Medical Evidence[4]**

**A.     Relevant Medical Evidence of Plaintiff's Physical Impairments**

**1.     <u>Walnut Grove Family Health Center</u>**

On September 12, 2006, Plaintiff underwent EMG testing of the upper and lower extremities that revealed bilateral carpal tunnel syndrome, moderate in degree, and polyneuropathy in both legs.  (Tr. 278.)  Gayle Ponder, M.D., evaluated Plaintiff on October 25, 2006.  (Tr. 312.)  Plaintiff's medical history was noted for hypertension and diabetes mellitus with neuropathy.  (*Id.*)  Plaintiff's weight was recorded at 294 pounds.  (Tr. 313.)  Dr. Ponder's examination revealed diminished vibratory sensation and decreased pinprick sensation in the lower leg and feet bilaterally.  (Tr. 315.)  Dr. Ponder diagnosed diabetes mellitus with neurological manifestations, hypertension, malaise and fatigue, and carpal tunnel syndrome.  (Tr. 316.)  The doctor recommended that Plaintiff start Januvia for his diabetes and see a neurologist.  (*Id.*)

On September 7, 2007, Plaintiff complained of body aches and chills, as well as "lightening" and shooting pains in the legs and arms.  (Tr. 328.)  His weight was 280 pounds.  (Tr. 330.)  Dr.

---

[3]Past relevant work is limited to work experience within the past 15 years.  20 C.F.R. § 404.1560(b)(1).

[4] The following medical evidence is taken from Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, later designated as "Pl.'s Br."

Rudy found that there was decreased sensation in the L3 through S2 dermatomes. (Tr. 331.) The doctor diagnosed uncontrolled diabetes mellitus with neurological manifestations. (*Id.*)

Dr. Ponder completed an Attending Physician's Statement of Impairment or Function on September 14, 2007. (Tr. 286-287.) Plaintiff's symptoms included pain in his hands and severe pain involving the feet and legs. (Tr. 286.) Dr. Ponder cited to nerve conduction studies that confirmed the presence of neuropathy. The doctor diagnosed diabetic peripheral neuropathy and carpal tunnel/cubital tunnel syndrome. Plaintiff's prognosis was "poor." Dr. Ponder opined that Plaintiff was totally disabled and he was not able to engage in vocational or medical rehabilitation. (*Id.*) Dr. Ponder opined that Plaintiff was able to sit three hours total, stand one hour total, and walk one hour total in an eight-hour workday. (Tr. 287.) Plaintiff could only walk 15 minutes at one time and stand for 20 minutes at a time. Dr. Ponder opined that Plaintiff could not use his hands for pushing/pulling or for fine manipulations. He was also restricted from using his feet for repetitive movements. Dr. Ponder assessed that Plaintiff could only occasionally bend, squat, and reach above shoulder level, and never crawl or climb. (*Id.*)

On October 18, 2007, Plaintiff was seen for follow-up of his neuropathy complaints. (Tr. 331.) He was diagnosed with uncontrolled diabetes. (Tr. 332.) Dr. Ponder completed a second Attending Physician's Statement on December 28, 2007. (Tr. 284-285.) It was noted that Plaintiff continued to have symptoms of severe pain in his feet and legs, pain with walking, as well as severe pain at times when his feet hung down while sitting. Dr. Ponder diagnosed diabetic neuropathy shown by EMG studies. (*Id.*) Dr. Ponder opined that Plaintiff could not work and failed to improve with numerous treatment modalities. (Tr. 285.)

On March 4, 2008, Plaintiff was seen for follow-up.  (Tr. 336.)  He was diagnosed with uncontrolled diabetes mellitus.  (Tr. 337.)  His weight was recorded at 281 pounds.  Dr. Ponder indicated that Plaintiff's blood sugars remained erratic, but his insurance would not cover an Insulin pump.   (*Id.*)   On June 2, 2008, Plaintiff was seen for a regular follow-up.  (*Id.*)   Dr. Ponder's examination revealed decreased sensation of the feet.  (Tr. 339-340.)  The doctor increased Plaintiff's dose of Lantus Insulin.  (Tr. 340.)  No significant changes were found at follow-up visits with Dr. Ponder on July 1, 2008, and July 22, 2008.  (Tr. 341-346.)  On September 16, 2008, Plaintiff complained of increasing shooting pain and paresthesia involving the feet and legs.  (Tr. 346-347.)  His weight was down to 270 pounds.  (Tr. 347.)  Dr. Ponder reported that there was decreased sensation in the feet to pinprick.  (Tr. 348.)  The doctor also noted that Plaintiff was depressed when he was in a lot of pain.  Dr. Ponder diagnosed diabetes with peripheral neuropathy, hypertension, and morbid obesity.  (Tr. 348-349.)  The doctor increased Plaintiff's dose of Insulin and recommended pain management.  (Tr. 349.)

In a narrative report dated October 9, 2008, Dr. Ponder reported that Plaintiff had been treated since 2005 for his diabetes and other general medical issues.  (Tr. 298.)  Dr. Ponder noted that Plaintiff had documented neuropathy in both legs that progressed to the point of definite work limitations by October 2006.  Insulin had not adequately controlled his diabetes.  It was also noted that Plaintiff had been subsequently started on Lyrica, but this was stopped due to an allergic reaction.  Dr. Ponder stated that there was no cure for Plaintiff's neuropathic pain and it was unlikely he would improve with treatment.   (*Id.*)

In a Multiple Impairment Questionnaire dated October 9, 2008, Dr. Ponder diagnosed peripheral neuropathy due to diabetes with unlikely improvement.  (Tr. 289-296.)  Clinical findings

5

included impaired gait and decreased sensation in the feet and lower legs.   (*Id.*)   Dr. Ponder cited

to EMG findings that confirmed bilateral polyneuropathy. (Tr. 290.)  Plaintiff's primary symptoms

were decreased tactile sensation to the lower legs and feet, which was "incapacitating," and constant

fatigue with excessive daytime sleepiness.   (*Id.*)   His pain was rated as moderately severe to severe,

8 to 10 on a 10-point scale, and his fatigue as moderately severe, 8 on a 10-point scale.  (Tr. 291.)

Dr. Ponder opined that Plaintiff was able to sit two hours total and stand/walk less than one

hour total in an eight-hour workday.   (*Id.*)   He needed to get up and move around every 30 to 60

minutes when sitting, and not sit again for 10 to 15 minutes.  (Tr. 291-292.)  It was also noted that

Plaintiff had significant limitations performing repetitive reaching, handling, fingering, and lifting

due to a history of carpal tunnel/cubital tunnel syndrome status-post surgery. (Tr. 292.) Dr. Ponder

opined that Plaintiff was essentially precluded from using his upper extremities for fine

manipulations and significantly limited in grasping, turning and twisting objects, and reaching.  (Tr.

292-293.)  It was noted that Plaintiff's pain, fatigue, or other symptoms were "frequently" severe

enough to interfere with his attention and concentration.  (Tr. 294.)  Dr. Ponder also found that

Plaintiff's severe pain and inability to work caused the patient to be depressed, which, in turn,

increased his sensitivity to pain.  The doctor opined that Plaintiff required two to three breaks a day

to rest at unpredictable intervals for 15 to 30 minutes at a time.   (*Id.*)   It was estimated that Plaintiff

would be absent from work, on average, more than three times a month due to his impairments and

treatment.  (Tr. 295.)

Jacki Grayson, M.D., began treating Plaintiff on February 2, 2009.  (Tr. 434.)  Plaintiff

complained of sleep apnea, high blood pressure, and diabetes mellitus with related numbness.  (*Id.*)

 His weight was recorded at 281 pounds and his height at 65.5 inches.  (Tr. 435.)  Plaintiff was

advised to increase his Lantus and start treatment with pain management. (Tr. 437.) On April 2, 2009, Plaintiff reported unchanged symptoms and was given an increased dose of Lantus. (Tr. 438-440.)

Dr. Grayson completed a Multiple Impairment Questionnaire on August 3, 2009, wherein she indicated that Plaintiff was seen every two to eight weeks. (Tr. 483-490.) Dr. Grayson diagnosed diabetes mellitus, idiopathic peripheral neuropathy, hypertension, and hyperlipidemia. (Tr. 483.) Clinical findings included decreased sensation in the bilateral lower extremities. (*Id.*) Dr. Grayson cited to lab studies of HgbA1C and fasting blood sugar levels that supported the diagnosis. (Tr. 484.) Plaintiff's primary symptoms were loss of sensation and extreme pain in the bilateral lower extremities. (*Id.*) His pain was rated as moderately severe, 8 on a 10-point scale, and his fatigue was rated as moderately severe, 7 on a 10-point scale. (Tr. 485.)

Dr. Grayson opined that Plaintiff was able to sit two hours total and stand/walk less than one hour total in an eight-hour workday. (*Id.*) Further, he needed to get up and move around every 30 minutes when sitting and not sit again for five minutes. (Tr. 485-486.) Dr. Grayson opined that Plaintiff's pain, fatigue, and other symptoms were "constantly" severe enough to interfere with his attention and concentration. (Tr. 488.) It was noted that depression exacerbated Plaintiff's level of pain. (*Id.*) Dr. Grayson estimated that Plaintiff would be absent from work, on average, more than three times a month. (Tr. 489.)

### 2.    Paul Schorr, D.O. – Examining Physician

Dr. Schorr evaluated Plaintiff in a consultation on October 1, 2009. (Tr. 451.) Plaintiff complained of bilateral hand, leg, and foot pain. His medical history was noted for diabetic polyneuropathy and carpal tunnel/cubital tunnel syndrome. (*Id.*) Dr. Schorr's examination revealed

slight pedal edema of the extremities, decreased pinwheel sensation in all extremities, and decreased light touch sensation in the right lower extremity. (Tr. 452.) Dr. Schorr reviewed an EMG showing bilateral carpal tunnel syndrome and polyneuropathy in both legs. The doctor diagnosed diabetes mellitus with peripheral neuropathy. He opined that Plaintiff's bouts of extremity pain were severe and precluded him from performing any gainful activity. (*Id.*)

Dr. Schorr completed a Multiple Impairment Questionnaire based on his evaluation. (Tr. 454-461.) He gave a "guarded" prognosis for the diagnosis of diabetes mellitus. (Tr. 454.) Clinical findings included decreased pinwheel sensation and sensory neuropathy involving the extremities. (*Id.*) Dr. Schorr cited to EMG findings and blood testing that supported the diagnosis. (Tr. 454-455.) Plaintiff's primary symptoms were burning/tingling pain in both lower extremities and both hands. (Tr. 455.) His pain was rated as severe, 10 on a 10-point scale and his fatigue as moderate, 5 on a 10-point scale. (Tr. 456.)

Dr. Schorr opined that Plaintiff was able to sit less than one hour total and stand/walk less than one hour total in an eight-hour workday. (*Id.*) He could not lift or carry even five pounds and had significant limitations in repetitive reaching, handling, fingering, and lifting due to diabetic polyneuropathy. (Tr. 457.) Dr. Schorr opined that Plaintiff was essentially precluded from grasping, turning and twisting objects, performing fine manipulations, and reaching. (Tr. 457-458.) It was assessed that Plaintiff's pain, fatigue, or other symptoms were constantly severe enough to interfere with his attention and concentration. (Tr. 459.)

### 3.   Harold Nachimson, M.D. – Consultative Examiner

Dr. Nachimson evaluated Plaintiff at the request of the Commissioner on December 10, 2008. (Tr. 359.) He complained of pain and tingling in his feet, his lower extremities, and his hands.

Plaintiff's medical history was noted for diabetes and carpal tunnel syndrome. (*Id.*) His weight was recorded at 274 pounds. (Tr. 360.) Dr. Nachimson diagnosed diabetes, hypertension, morbid obesity, peripheral diabetic neuropathy, past history of drug and alcohol use, bilateral carpal tunnel syndrome, and cubital tunnel syndrome. (Tr. 362.) Dr. Nachimson did not provide an opinion on Plaintiff's limitations.

**B.      Relevant Medical Evidence of Plaintiff's Mental Impairments**

**1.      Solace Counseling Associates**

Plaintiff began treatment at Solace Counseling with psychiatrist, Dhiren Patel, D.O. on August 14, 2004. (Tr. 411.) Plaintiff complained of depressed mood, anhedonia, disturbed sleep, disturbed appetite, low energy, irritability, frequent tearfulness, and agitation. He admitted to opioid abuse. (*Id.*) A mental status examination revealed a restricted affect and agitated psychomotor activity. (Tr. 412.) Dr. Patel diagnosed opioid dependence with a GAF score of 48.[5] (*Id.*) On September 27, 2004, Dr. Patel's mental status examination revealed a depressed mood and restless affect. (Tr. 409.) The doctor diagnosed chronic pain and major depressive disorder and prescribed Cymbalta. There was no evidence of ongoing opioid abuse. Plaintiff's GAF score remained at 48. (*Id.*) Subsequent progress notes document no significant changes through July 23, 2009. (Tr. 309-310, 404-408.)

On November 13, 2006, Plaintiff presented for follow-up. (Tr. 307.) His medications were Subutex, for opioid dependence, and Cymbalta, for depression. Dr. Patel reported that the mental

_____

[5] The Global Assessment of Functioning ("GAF") scale is used in reporting of overall functioning. A GAF score of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders 4th Ed. Text Revision ("DSM"), p. 32-34.

status examination was unchanged from previous evaluations.  He diagnosed chronic pain.  (*Id.*)

On January 22, 2007, no changes were noted, but Dr. Patel assessed Plaintiff's GAF score at 65.[6]

(Tr. 308.)  Dr. Patel's treatment records document no change in Plaintiff's condition through October

13, 2008, other than notations of fluctuating GAF scores.  (Tr. 300-306.)

 In a report dated March 6, 2009, Dr. Patel noted that Plaintiff "has been a patient of mine and,

in my best medical opinion, is totally disabled without consideration of any past or present drug

and/or alcohol use.  Drug and/or alcohol use is not a material cause of this individual's disability."

(Tr. 428.)  Subsequent treatment notes from Dr. Patel through January 28, 2010, repeatedly noted

that Plaintiff was stable and diagnosed with major depressive disorder and chronic pain.  (Tr. 430-

431, 639.)

 Dr. Patel completed a Psychiatric/Psychological Impairment Questionnaire dated April 19,

2010, which was submitted to the Appeals Council.  (Tr. 606-613.)  Dr. Patel diagnosed chronic

pain, diabetic neuropathy, and opiate dependence.  (Tr. 606.)  He was given a "guarded" prognosis.

(*Id.*)  Clinical findings included poor memory, sleep disturbance, mood disturbance, emotional

lability, substance dependence, and anhedonia or pervasive loss of interests.  (Tr. 607.)  Plaintiff's

primary symptoms included depression, anxiety, and pain.  (Tr. 608.)  Dr. Patel reported that the

limitations described in the questionnaire had been present since 2005.  (Tr. 613.)

 Dr. Patel opined that Plaintiff was markedly limited (defined as effectively precluded) in his

ability to remember locations and work-like procedures; his ability to understand and remember

detailed instructions; his ability to carry out detailed instructions; his ability to complete a normal

---

[6] A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.  DSM, p. 32-34.

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to accept instructions and respond appropriately to criticism from supervisors; and his ability to travel to unfamiliar places or use public transportation. (Tr. 609-611.) In addition, it was noted that Plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation and/or experience exacerbation of signs and symptoms. (Tr. 611.) He was found incapable of even low stress work. (Tr. 612.) Dr. Patel estimated that Plaintiff would be absent from work, on average, more than three times a month. (Tr. 613.)

## 2. **Psychiatric Center of North Texas**

K. Thomas Varghese, M.D., a psychiatrist, evaluated Plaintiff on March 13, 2007. (Tr. 272.) Plaintiff stated that he was concerned that he had bipolar disorder. (*Id.*) A mental status examination revealed depressed mood, blunted affect, paranoia, persecutory delusions, suicidal thoughts, and fair insight and judgment. (Tr. 273.) Dr. Varghese diagnosed bipolar disorder,[7] diabetic neuropathy, and carpal tunnel syndrome. His GAF score was 50, indicating serious symptoms or serious impairment in functioning. DSM, p. 32-34. Plaintiff was advised to continue Cymbalta. (*Id.*) On March 27, 2007, Plaintiff was seen for follow-up with complaints of neuropathic pain and thoughts of suicide. (Tr. 271.) Dr. Varghese prescribed Geodon. (*Id.*) On April 10, 2007, Plaintiff reported only "slight" improvement. (Tr. 270.) He had to stop Geodon because of side-effects and started Lamictal for his bipolar disorder. (*Id.*)

---

[7] Bipolar disorders include Bipolar I Disorder, characterized by one or more manic or mixed episodes accompanied by major depressive episodes, and Bipolar II Disorder, characterized by one or more major depressive episodes accompanied by at least one hypomanic episode. DSM, p. 345.

On May 9, 2007, Plaintiff reported fluctuating moods with days when he was depressed and slept for days and days when he felt "great." (Tr. 269.) No changes were noted at follow-up visits on May 30, 2007, and June 27, 2007. (Tr. 267-268.) On July 28, 2007, Plaintiff was prescribed Elavil. (Tr. 266.) On August 29, 2007, Plaintiff reported having good days and bad days. (Tr. 265.) He was to continue his medications. (*Id.*)

### 3. <u>George R. Mount, Ph.D. – Examining Psychologist</u>

Dr. Mount evaluated Plaintiff on October 7, 2009. (Tr. 463.) He complained of mood swings. His medications were Lamictal, Lyrica, and Insulin. (*Id.*) Plaintiff reported disturbed sleep, spending most of his time at home, and few interests outside the home. (Tr. 464.) A mental status examination revealed restless behavior, labile mood, fluctuating energy, suicidal thoughts, depression most of the time, and fair insight. (*Id.*) On the Million Clinical Multiaxial Inventory-III ("MCMI-III"), Plaintiff's scores were consistent with depression, bipolar disorder, and borderline personality disorder. (Tr. 464-465.) Dr. Mount diagnosed bipolar disorder, most recent episode depressed, without psychotic features, and borderline personality disorder. (Tr. 465.) Plaintiff's GAF score was 50, which is indicative of serious symptoms or serious impairment in functioning. (*Id.*)

Dr. Mount completed a Psychiatric/Psychological Impairment Questionnaire wherein he identified clinical findings of appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, variable energy, manic syndrome, and irritability. (Tr. 476.) Dr. Mount opined that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions; his ability to

maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; his ability to sustain ordinary routine without supervision; his ability to work in coordination with or proximity to others without being distracted by them; his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and his ability to interact appropriately with the general public.  (Tr. 478-479.)  Dr. Mount also found that Plaintiff experienced episodes of deterioration or decompensation in work or work-like settings that caused him to withdraw from that situation and/or experience exacerbation of signs and symptoms. (Tr. 480.) He was found incapable of even low stress work.  (Tr. 481.)

### 4. Katherine Donaldson, Psy.D. – Consultative Psychologist

At the request of the Commissioner, Dr. Donaldson evaluated Plaintiff on December 2, 2008. (Tr. 351.)  Dr. Donaldson observed that Plaintiff appeared to neglect his hygiene, as evidenced by his body odor.  He reported feeling depressed at times and a possible diagnosis of bipolar disorder. (*Id.*)  Plaintiff reported distracting himself from his family, few social interactions, and difficulty focusing and completing tasks.  (Tr. 352.)  Plaintiff admitted to a history of drug and alcohol use, but no use of any substances since 2004.  (Tr. 353.)  A mental status examination revealed poor hygiene, verbose speech with tangential answers, depressed and anxious mood, and minimal insight into coping.  (Tr. 354-355.)  Dr. Donaldson diagnosed bipolar I disorder, most recent episode hypomanic, polysubstance dependence in remission (on Subutex), diabetes mellitus, and peripheral neuropathy. (Tr. 355.)  His GAF score was 48.  (*Id.*)  Dr. Donaldson opined that Plaintiff would

have difficulty making occupational and social adjustments, but recommended that he obtain regular treatment, which might help his symptoms.  (Tr. 355-356.)

### Plaintiff's Testimony at the Hearing

Plaintiff, represented by counsel, testified on his own behalf at the hearing held on October 8, 2009. (Tr. 49-101.) Plaintiff testified that he stopped working as a result of severe neuropathy and pain in his hands.  (Tr. 59.)  He reported experiencing pain everywhere, but primarily affecting his feet and hands.  (Tr. 61.)  He described his pain as tender and burning, or sore at times, and so intense that it had made him think of killing himself.  (Tr. 68.)  He rated his pain as 7 on a 10-point pain scale, with 10 being the worst pain, even with his medications.  (Tr. 69-70.)  He testified to experiencing this pain daily, usually several times a day.  (Tr. 70.)  Regarding his diabetes, Plaintiff stated that it is not under control and his blood sugar swings high and low.  (Tr. 66-67.)  He testified that it swings high a few times a week, and this causes him to be very fatigued.  (Tr. 67.)  He stated that he has sores from the diabetes, but it is the neuropathy (a result of the diabetes) that affects him the most.  (Tr. 67.)

Plaintiff testified that he generally does not walk for more than one hour.  (Tr. 72.)  He stated that he can't stand for more than 20 minutes at a time.  (Tr 73.)  Plaintiff testified that he has difficulty grasping items and using his fingers for manipulating objects.  (Tr. 85-86.)  Regarding his bipolar disorder, Plaintiff described having manic episodes, or good days, that lasted approximately three to five days a week.  (Tr. 65.)  Other days, he was very depressed and slept a lot.  (Tr. 66.)  Plaintiff stated that he did not get along well with other people, especially supervisors, and that is why he has worked over forty jobs that lasted less than six months.  (Tr. 60, 62-63.)  He also testified

14

to having difficulty with concentration and finishing tasks.  (Tr. 63.)  Plaintiff stated that he only

showers about once a month.  (Tr. 74-75.)

Regarding his daily activities, Plaintiff testified that he prepares simple meals, but his wife

cooks all their major meals.  (Tr. 76.)  He stated that he cannot do any of the yard work or household

cleaning, but occasionally he washes dishes.  (*Id.*)  Plaintiff has a valid driver's license, but he only

drives to locations that are within five to ten minutes of his home.  (Tr. 76-77.)  He testified that he

does not socialize with any friends, or attend church or any social gatherings.  (Tr. 77.)  Plaintiff's

wife suffers from Lupus, but was able to take care of Plaintiff when he had problems with

functioning.  (Tr. 82.)  Similarly, Plaintiff also has had to help his wife sometimes, especially with

the laundry.  (Tr. 82.)  Plaintiff testified that he weighs approximately 255 pounds, but his weight

has been as high as 315 pounds in the past.  (Tr. 61.)

### The Hearing

The VE, Mr. Hardin, also testified at the hearing. The ALJ posed a hypothetical question

to the VE. The VE responded that an individual of Plaintiff's age, education, and work history

who was limited to lift and carry 20 pounds occasionally and 10 pounds frequently; who had no

limitations sitting; who could stand or walk individually or in combination four hours in an eight-

hour workday for no more than 15 to 20 minutes at a time; could not perform any climbing of

ladders, scaffolds, or ropes; only occasional climbing of ramps and stairs, balancing, stooping,

kneeling, crouching, and crawling; no operation of foot controls; work that involved detailed but

not complex job instructions; and who could have no extensive and involved contact with the

public and supervisors, would be unable to perform Plaintiff's past work.  (Tr. 86-87.)  However,

he testified such an individual could perform other work as an electronics worker, a small

15

products assembler, and an injection molding machine tender.  (Tr. 88.)  The VE testified that all

of these jobs required frequent use of the hands.  (Tr. 93.) He stated that his testimony did not

conflict with the Dictionary of Occupational Titles ("DOT").   (Tr. 89.)

Upon cross-examination by Plaintiff's counsel, the VE stated that an individual who

could not stand for more than one hour, who required a 15 to 30 minute break every hour to

switch positions, and who had only occasional use of their hands and only occasional ability to

squat, stoop, kneel, and crouch, would be unable to perform any work.  (Tr. 94.)  The VE

testified that the maximum number of breaks allowed were a 10-minute break mid-morning and

mid-afternoon and a 30 to 60 minute break for lunch.  (Tr. 90.)  The VE stated that more than

two absences a month would not be tolerated for employment.  (*Id.*)   He also testified that an

individual who was off task one-third of the day because of pain would be unable to work.  (Tr.

94.)

### The Decision

In the November 18, 2009 decision, the ALJ found that Plaintiff had the following severe

impairments:  insulin-dependent diabetes mellitus, diabetic neuropathy, hypertension, opioid

dependence, bipolar disorder, carpal tunnel syndrome, mild cervical degenerative disc disease, and

obesity.  (Tr. 36.)  Despite these impairments, the ALJ found that Plaintiff retained the RFC to lift

and carry 20 pounds occasionally and 10 pounds frequently; sit throughout an eight-hour workday;

stand and walk (individually or in combination) for four hours in an eight-hour workday with no

walking or standing for extended periods (no more than 15 to 20 minutes); no climbing ladders,

scaffolds, or ropes; only occasionally balancing, stooping, kneeling, crouching, or crawling, and no

operating foot controls with the bilateral lower extremities; and limited to jobs with no extensive and

16

involved contact with the public and supervisors, and jobs involving detailed, but not complex, instructions.  (Tr. 36-43.)  Based on this RFC, the ALJ found that Plaintiff was unable to perform any of his past relevant work, but that he could perform other work as an electronics worker, a small products assembler, or an injection molding machine tender.  (Tr. 43-44.)

### Standard of Review

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act.  *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1.	An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.	An individual who does not have a "severe impairment" will not be found to be disabled.

3.	An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.	If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5.	If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability.

*Leggett*, 67 F.3d at 564.  The inquiry terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies

his burden under the first four steps, the burden shifts to the Commissioner at step five to show that

there is other gainful employment available in the national economy that the claimant is capable of

performing.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied

either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational

testimony, or by other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference.  *Leggett*, 67 F.3d at 564.

Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits

is supported by substantial evidence and to whether the proper legal standard was utilized.

*Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g).  Substantial evidence is defined as "that which is

relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must

be more than a scintilla, but it need not be a preponderance."  *Leggett*, 67 F.3d at 564.  The

reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but

rather scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38

F.3d 236.  However,  "[t]he ALJ's decision must stand or fall with the reasons set forth in the

ALJ's decision, as adopted by the Appeals Council."  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir.

2000).  Moreover, the terms of 20 C.F.R. § 404.1527 define "medical opinions" and instruct

claimants how the Commissioner will consider the opinions.[8]  In the Fifth Circuit, "the opinion of

the treating physician who is familiar with the claimant's impairments, treatments and responses,

should be accorded great weight in determining disability." *Newton*, 209 F.3d at 455; *see Floyd v.

*Bowen*, 833 F.2d 529, 531 (5th Cir.1987).

### Issues

1.      Whether the ALJ failed to follow the Treating Physician Rule.

2.      Whether the ALJ failed to consider Plaintiff's obesity.

3.      Whether the ALJ failed to properly evaluate Plaintiff's credibility.

4.      Whether the Appeals Council did not properly evaluate new and material evidence.

### Analysis

### Whether the ALJ failed to follow the Treating Physician Rule

Plaintiff first alleges that the ALJ failed to give proper weight to his treating physicians'

opinions.  (Pl.'s Br. at 14.)  The opinion of a treating physician who is familiar with the claimant's

impairments, treatments, and responses should be accorded great weight in determining disability.

*See Newton,* 209 F.3d at 455 (citing *Leggett*, 67 F.3d at 566; *Greenspan*, 38 F.3d at 237).  A treating

physician's opinion on the nature and severity of a patient's impairment will be given controlling

---

[8]  The terms of 20 C.F.R. § 404.1527(a)(2) provide:

(2) Evidence that you submit or that we obtain may contain medical opinions. Medical
opinions are statements from physicians and psychologists or other acceptable medical
sources that reflect judgments about the nature and severity of your impairment(s),
including your symptoms, diagnosis and prognosis, what you can still do despite
impairment(s), and your physical or mental restrictions.

weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."   20 C.F.R. § 404.1527(d)(2).   In many cases, a treating physician's opinion is entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.   *See* SSR 96-2p.   On the other hand "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456.   If good cause is shown, then the ALJ may accord the treating physician's opinion less weight, little weight, or even no weight.   *Paul v. Shalala,* 29 F.3d 208, 211 (5th Cir. 1995). If the ALJ does not accord a treating doctor's opinion controlling weight, the ALJ must set forth specific reasons for the weight given, supported by the medical evidence in the record. *See* 20 C.F.R. § 404.1527(d)(2). The reasons must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. The ALJ must explain the weighing in the decision, and the weight will stand or fall on the reasons set forth in the opinion. *Newton,* 209 F.3d at 455.

Here, the ALJ failed to give any weight to the treating-physician opinions of Drs. Ponder, Grayson, and Patel. The ALJ gave no weight to Dr. Ponders' opinion dated October 2006, her interrogatory in September of 2007, her December 2007 opinion, and her lengthy report and interrogatory in October of 2008 because the ALJ found that those opinions "warrant[ed] very limited probative value in th[e] matter". (Tr. 38-39.) The ALJ failed to give weight to the opinions dated September 2007, December 2007, and October 2008 because in February of 2009, a physical and neurological examination of Plaintiff "was excellent" and Plaintiff made no mention of

complications due to his diabetes.  (*Id.*)  However, upon examination of that same record, although the doctor diagnoses Plaintiff with "diabetes mellitus without mention of complication", the doctor also makes the notations that regarding numbness, Plaintiff indicates that the severity is increasing; Plaintiff reports "symptoms of polyuria, polydipsia, polyphagia, and paresthesia (tingling) in feet"; Plaintiff's "diabetic condition is currently severe"; and Plaintiff's "diabetes is worsening".  (Tr. 434, 436.)  The Court is unable to discern how these notations made by the doctor indicate an "excellent" physical and neurological examination of Plaintiff.  Furthermore, how the ALJ could rationalize discrediting three consistent opinions of Dr. Ponder, who treated Plaintiff repeatedly over the course of two years, is preposterous.

Additionally, the ALJ gave no weight to Dr. Ponder's opinion in October 2006 that Plaintiff had keyboarding restrictions due to carpal tunnel syndrome because his carpal tunnel syndrome was later corrected through surgery.  (Tr. 37, 39.)  However, the Court points out that in her October 2008 opinion, written well after Plaintiff's surgery, Dr. Ponder opined that Plaintiff had significant limitations performing repetitive reaching, handling, fingering, and lifting due to a history of carpal tunnel/cubital tunnel syndrome status-post surgery.  (Tr. 292.)  This opinion was later confirmed by the October 2009 examination performed by Dr. Schorr, wherein he indicated that Plaintiff had significant limitations in repetitive reaching, handling, fingering, lifting, grasping, and performing fine manipulations.  (Tr. 457.)  Dr. Ponders' opinions are consistent with her contemporaneous treatment notes, consistent with the other medical evidence in the record, and not conclusory, as even the ALJ pointed out that in October 2008, Dr. Ponder completed an "extensive" interrogatory.  (Tr. 38.)  The ALJ failed to show good cause as to why the opinions of Dr. Ponder should have been given no weight.

The ALJ also gave no weight to the August 2009 opinion of the treating physician, Dr. Grayson because the ALJ found it had no probative value in the matter because Plaintiff's condition was improving. (Tr. 39.) The ALJ explained that treatment notes from June 2009 indicated that Plaintiff's diabetes was improving, he had no symptoms from his diabetes, and his numbness was only moderate. (*Id.*) However, in those same records, the ALJ fails to mention that Dr. Grayson noted that Plaintiff reported "symptoms of pain in [his] feet and legs, paresthesia (tingling) in [his] feet, and numbness." (Tr. 443.) Furthermore, Plaintiff reported hypertension and hyperlipidemia, paresthesia and numbness, and diabetes. (Tr. 444.) Clearly, the ALJ simply cherry-picked a few statements from Dr. Grayson's treatment notes, and then used those statements to discredit Dr. Grayson's entire opinion. Additionally, a few months prior, Plaintiff's diabetes was described as severe, and two months later, the doctor's treatment notes indicated that Plaintiff had loss of sensation and extreme pain in his bilateral lower extremities. (Tr.434, 484-485.) His pain was rated as moderately severe, 8 on a 10-point scale, and his fatigue was rated as moderately severe, 7 on a 10-point scale. (Tr. 484-485.)

Inexplicably, subsequent to discounting the August 2009 opinion of Dr. Grayson, the ALJ then stated that he accepted her opinion over that of the examining physician, Dr. Schorr, who opined in October of 2009 that Plaintiff was unable to work. (Tr. 39.) Thus, while the ALJ states on the one hand that he discredits Dr. Grayson's August 2009 opinion, he simultaneously uses her June 2009 treatment notes to discount another doctor, Dr. Schorr's opinion, which is actually consistent with Dr. Grayson's August 2009 opinion. The ALJ must consider the entire record and cannot "pick and choose" only the evidence that supports his position. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). "The [proper] inquiry [] is whether the record, read as a whole, yields such

evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Id*. In this case, the ALJ erred by picking and choosing certain notations made by Dr. Grayson on one occasion to support a finding of non-disability. Drs. Ponder, Grayson, and Schorr, all either treating or examining physicians, provided medical opinions regarding Plaintiff's physical impairments that are not only consistent with one another, but that are also consistent with the medical evidence of record. The ALJ failed to show good cause as to why Dr. Grayson's medical opinion should have been discounted.

Finally, the ALJ also gave no weight to the treating psychiatrist, Dr. Patel. Dr. Patel treated Plaintiff over the course of five years for chronic pain and major depressive disorder. In March of 2009, Dr. Patel opined that Plaintiff was unable to work. The ALJ found this opinion "warrant[ed] no probative value in th[e] matter" because Dr. Patel had recently assigned Plaintiff a relatively high GAF score of 85 and noted his condition was stable. (Tr. 39.) However, the ALJ failed to discuss Dr. Patel's treatment notes from July 2006 through October 2008, wherein Plaintiff's GAF score varied from 52 to 85. (Tr. 300-310.) Additionally, in 2004, Plaintiff's GAF score was as low as 45. (Tr. 408.) Furthermore, the ALJ concedes that two examining physicians, Dr. Donaldson and Dr. Mount assigned Plaintiff relatively low GAF scores of 48 and 50 in December 2008 and October 2009, respectively. The ALJ found that Dr. Patel's opinion should be accorded no weight, but he failed to provide good cause as to this finding. Furthermore, as explained below, the ALJ should have at least weighed the § 404.1527(d)(2) factors prior to rejecting his opinion.

Plaintiff next argues that even if the treating physician's opinions were not controlling, the ALJ still committed error by failing to weigh the regulatory factors in 20 C.F.R. § 404.1527(d)(2). (Pl.'s Br. at 16.) If the ALJ determines that the treating physician's opinion is not entitled to

controlling weight, the ALJ must evaluate: the length of the treatment relationship and the frequency

of examination; the nature and extent of the treatment relationship; the supporting evidence

presented by the physician; the level of consistency between the physician's opinion and the record;

the physician's specialization; and any other relevant factors. 20 C.F.R. § 404.1527(d)(2)-(6). *See*

*also Newton,* 209 F.3d at 456.  In *Newton,* the Court held that "absent reliable medical evidence from

a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject

the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating

physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  209 F.3d at 453.

Defendant concedes that the ALJ did not perform an analysis of the regulatory factors, but

contends that under *Newton,* an analysis was not required because an examining physician, Dr.

Nachimson, provided medical evidence which controverted the opinions of Drs. Ponder and

Grayson. (Def.'s Br. at 6-7.) This argument fails for several reasons.

First, Defendant claims that Dr. Nachimson's opinion controverts the opinions of Drs.

Ponder and Grayson because in December of 2008, Dr. Nachimson found that Plaintiff "had a

full range of motion for upper and lower extremities and normal muscle tone, muscle strength,

and hand grip, even though his gait was somewhat waddling." (*Id.* at 7.) However, it is unclear to

this Court as to how this statement contradicts the treating physician's opinions. Drs. Ponder and

Grayson provided opinions regarding Plaintiff's functional limitations and what Plaintiff could

still do despite his impairments. Dr. Nachimson failed to even provide an opinion regarding

Plaintiff's functional limitations. (*See* Tr. 359-62.) Moreover, in his examination, Dr. Nachimson

noted that Plaintiff "had a fairly complete evaluation by Walnut Grove Family Health Center."

(Tr. 362.) It seems incredulous that Dr. Nachimson would be in disagreement with Drs. Ponder

and Grayson, yet indicate in his examination that they performed a fairly complete evaluation of Plaintiff.

Furthermore, *assuming arguendo* that Dr. Nachimson did provide an opinion that contradicted the opinions of Drs. Ponder and Grayson, Dr. Nachimson did not evaluate Plaintiff's mental impairments and thus clearly could not have contradicted the opinion of Dr. Patel. Therefore, at a bare minimum, the ALJ should have at least analyzed the regulatory factors when deciding to discount the opinion of Dr. Patel. However, the ALJ failed to cite or apply the § 404.1527(d)(2) factors to any of Plaintiff's treating sources.

In sum, the Court finds that the ALJ committed legal error by failing to properly weigh the treating physician's opinions. Moreover, the Court finds that the ALJ committed legal error by failing to consider the factors set forth in the Commissioner's regulations for evaluating the treating physician's opinions. The error is not harmless because if the ALJ had given more weight to the treating physician's opinions, he may have found Plaintiff disabled. All three of the treating sources opined that Plaintiff would be absent from work, on average, more than three times a month due to his impairments. At the hearing, the VE testified that if a person missed work more than two days a month on a consistent and ongoing basis, that person would not be able to sustain employment.  Thus, Plaintiff has shown prejudice from the ALJ's failure to properly weigh his treating source's opinions.

The Court finds that the ALJ's legal errors in considering the medical evidence will necessarily require reconsideration, not only of the medical evidence, but of the remaining issues as well.

**Conclusion**

For the foregoing reasons, this Court REVERSES the Commissioner's final decision and REMANDS the case for reconsideration consistent with this Opinion.

SO ORDERED, September 28, 2012.

_____

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE